PAYNE, Secretary of the Interior, v. UNITED STATES ex rel. MOSIER et al.

(Court of Appeals of District of Columbia. Submitted October 6, 1920. Decided January 3, 1921.)

No. 3422.

1. Indians ⬤—16(7)—Bonus for oil lease to be paid to minors' parents as "royalty."

Under Act June 28, 1906, § 7, providing that parents of minor members of the Osage Tribe shall have the control and use of the minors' lands, with the proceeds thereof, and that interest on funds held in trust shall be paid to the parents, and royalty from oil and other mineral leases paid in the same manner, a bonus paid by the successful bidder for an oil lease is to be paid to the parents, as the word "royalty" is not used in a restricted sense, but in the sense of "proceeds."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Royalty.]

2. Gifts ⬤—5(1)—"Bonus" is not a gift.

A "bonus" is not a gift or gratuity, but a sum paid for services, or upon a consideration, in addition to or in excess of that which would ordinarily be given.

[Ed. Note.—For other definitions, see Words and Phrases, First and Series, Bonus.]

---

⬤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**3. Indians ⚡⟶16 (7)—Commissioner not authorized to withhold payments to minors' parents, because not used exclusively for their benefit.**

Under Act June 28, 1906, § 4, providing that interest on funds held in trust for minor members of the Osage Tribe of Indians may be withheld by the Commissioner of Indian Affairs, if it is being misused or squandered, royalties on oil leases paid to a minor's parents may be used in the upkeep of the family and on an increasing scale of comfort, as the increasing income justly warrants, and the commissioner cannot limit the payments because they are not being used exclusively for the minor's benefit.

**4. Indians ⚡⟶23—Use of minors' funds in hazardous undertakings or extravagant expenditures may be restrained; "misuse;" "squandering."**

The use of the funds of minor members of the Osage Tribe of Indians in hazardous or speculative undertakings, or in lavish or extravagant expenditures, is a "misuse" or "squandering" of them, which the Commissioner of Indian Affairs may restrain, under Act June 28, 1906, § 4.

[Ed. Note.—For other definitions, see Words and Phrases, Misuse; Squandered.]

**5. Indians ⚡⟶23—Commissioner may require statement of expenditures by parents of minors' moneys.**

Under Act June 28, 1906, § 4, the Commissioner of Indian Affairs may require the parents of minor members of the Osage Tribe to furnish periodical statements of expenditures of the moneys of the minors received by them, in order that he may determine whether such moneys are being misused or squandered.

Smyth, Chief Justice, dissenting.

Appeal from the Supreme Court of the District of Columbia.

Mandamus by the United States, on the relation of W. T. Mosier and another, against John Barton Payne, Secretary of the Interior. From a judgment granting the writ, defendant appeals. Affirmed.

C. Edward Wright, and Charles D. Mahaffie, both of Washington, D. C., for appellant.

F. W. Clements, of Washington. D. C., and T. J. Leahy, of Pawhuska, Okl., for appellees.

ROBB, Associate Justice.. Appeal from a judgment in the court below directing the issuance of a writ of mandamus, requiring the Secretary of the Interior to pay appellees moneys derived as interest on a trust fund belonging to their minor children and moneys received from the shares of those minors as royalties and income from oil, gas, and other minerals belonging to the Osage Tribe of Indians, to which appellees belong.

Being satisfied with the reasoning and conclusions of the learned trial judge, we adopt his opinion, as follows:

"This case came on for final hearing upon the pleadings and an agreed statement of facts, and was argued by counsel for the respective parties and submitted.

"The action is one for a writ of mandamus to require the Secretary of the Interior to pay to the relators, as the parents of certain minor children who are duly enrolled members of the Osage Tribe of Indians, 'all moneys derived as interest on the trust fund of said minors from oil and gas and other minerals belonging to said tribe of Indians.'

"Two questions are presented by the case. One is whether money derived from the successful bidder for an oil lease of land belonging to the minor

⚡⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

children of the relators, such money being called 'bonus money,' is payable to the relators, as the royalty prescribed in the lease itself is payable to them. And the other question is whether the respondent can limit the amount of moneys that may be received by the parents of said minor children or require the relators to render statements of account of moneys received by them, in order that the Commissioner of Indian Affairs may satisfy himself that such moneys are not being misused or squandered by the relators, or that if they are that further payments may be withheld.

"These questions to be answered by a consideration of the provisions of the Act of Congress approved June 28, 1906 (34 Stat. p. 544). This act is a comprehensive piece of legislation having for its object the division of the lands and funds of the Osage Indians on the then territory of Oklahoma, and it is so entitled. In effecting its object striking evidence of its policy with respect to the interests of minors having living parents is manifest. By section 2 of the act it is provided that selections of the lands belonging to such minors 'may be made by said parents'; and by the proviso of section 7 it is enacted 'that parents of minor members of the tribe *shall have the control and use of said minors' lands, together with the proceeds of the same, until said minors arrive at their majority.'* (Underscoring by the court.) Section 4 provides that the interest to be paid by the United States on certain funds and moneys belonging to minors and held in trust for them by the government 'shall be paid quarterly *to the parents* until said minors arrive at the age of twenty-one years.' And by the same section it is provided that royalty received from oil and other mineral leases upon the land selected and divided as stated above, and moneys received from the sale of other specified lands shall be distributed to the individual members of the Osage Tribe 'in the same manner and at the same time that payments are made of interest on other moneys held in trust for the Osages by the United States.'

[1] "It seems clear from the foregoing résumé of the material portions of the statute under consideration that it was the intention of the Congress to give to the *parents* of minor members of the tribe the *beneficial use* of so much of their children's property as is to be divided and distributed under the terms of the law, during the children's minority. But it is insisted by the respondent that the so-called bonus money was not included in the distribution thus directed. Not in terms, it is true, but at the time of the enactment of the statute the practice of obtaining bonus money had not made its appearance, and did not do so until a decade later when the increasing demand for oil, which it was believed existed in large and paying quantities under the surface of these Indian lands, suggested the plan of requiring prospective oil lessees to bid for leases, and the sums paid by the successful bidders for leases constitute the bonus money. This money may not be royalty in the strict sense of the word, but it is certainly money derived from 'oil * * * leases upon the lands,' to quote the language of the statute. No leases, no royalty. No leases, no bonus. Leases, bonus certainly, royalty perhaps, if the minerals are discovered to exist in paying quantities.

[2] "The Supreme Court has furnished us with a legal definition of the word 'bonus.' In the case of Kenicott v. Wayne County, 16 Wall. 452, 471 (21 L. Ed. 319), the court says: 'But, secondly, the meaning of the word "bonus" is not that given to it by the objection. It is thus defined by Webster: "A premium given for a loan or a charter or other privilege granted to a company; as, 'The bank paid a bonus for its charter;' a sum paid in addition to a stated compensation." It is not a gift or gratuity, but a sum paid for services, or upon a consideration in addition to or in excess of that which would ordinarily be given.'

"Applying that definition in the instant case, it is apparent that the bonus derived from the leases is 'a sum paid * * * upon a consideration in addition to or in excess of that which would ordinarily be given,' the latter being royalty in its strict sense.

"But did the Congress use the word in the restricted sense? It was providing in a complete manner for the making of oil and other mineral leases upon the lands of the Indians, and directed that the proceeds be distributed to the owners thereof and in the case of minor owners the proceeds were to

go, during their minority, to the parents of such minors. There is no evidence in the statute that any proceeds derived from the leases were not to be distributed as directed, except as enacted in the first proviso of section 4, hereafter to be considered in connection with the second of the two questions which this case raises.

"The court is of the opinion that Congress did not use the word 'royalty' in the restricted sense, but used it in the sense of the word 'proceeds,' to be distributed in the way directed. The whole scheme and structure of the act justifies and requires this interpretation. What reason of the apparent policy of the law suggests a different interpretation? None. It gives to the parents of minors the control and use of the minors' lands and as well the proceeds of the same. It gives to them the royalty received from the oil leases and all other mineral leases upon said lands. What else more could it give, except complete ownership and title?

"This in effect is the conclusion reached by the Comptroller of the Treasury in the following language: 'I am constrained to decide that, within the purpose and meaning of the act, bonus money received from the sale of leases for oil, etc., *should be classed with royalties* and which is required by the second exception to section 4 *to be placed in the Treasury* to the credit of the members of the Osage Tribe of Indians as other moneys of said tribes are to be deposited, for distribution to the individual members of said Osage Tribe, and therefore that said bonus moneys do not bear interest.' 23 Decisions of Comptroller of the Treasury, Pages 483, 486. (Underscoring by the court.)

"For the foregoing reasons the answer to the first of the two questions propounded is that the so-called bonus money is payable to the relators as a part of the royalty received from oil leases.

[3-5] "Coming now to the second question to be answered, it is to be observed that the contention of the respondent in this respect rests upon his interpretation of the first proviso of section 4 of the statute. That proviso is in the following language: 'Provided, that if the Commissioner of Indian Affairs becomes satisfied that the said interest of any minor is being misused or squandered he may withhold the payment of such interest.'

"The respondent's interpretation of this proviso takes the form of a limitation upon the use by the parents of a minor of the money of the latter paid to the former, both in respect of the amount and its application. He insists that such money can be used only for the benefit of the minor exclusively, and if not so used it would be deemed by the Commissioner of Indian Affairs as a misuse or a squander of said money, and further payments would be withheld except to the amount of $40 per month.

"In the opinion of the court this is an unwarrantable interpretation. It is plain that the Congress intended that the parents of minors should have the use of this money, as they are to have the use of the minors' lands and the proceeds of the same. A use, no doubt, that shall be wise, and calculated to improve the standards of their lives, to insure the education and maintenance of their children, and to produce a home environment tending to make better and more contented citizens.

"To use these funds in hazardous or speculative undertakings or in lavish and extravagant expenditures would be to misuse or squander them, and in that event the restraining hand of the Commissioner of Indian Affairs could and should be laid upon them. These are the possibilities that the limitation of the proviso is designed to guard against. It was not intended to clothe the Commissioner or the respondent with authority to dictate the limit of the amount that the parents could expend *exclusively* upon their minor children from these moneys. The statute makes the parents, not the Commissioner or the respondent, the judges in the first instance of the judicious use of the moneys in question. They may be used in the upkeep of the family and on an increasing scale of comfort as an increasing income may justly warrant. But in order that the Commissioner may inform himself as to whether the limitation of the proviso, *as its boundaries have been marked out herein,* are observed by the parents of the minors, it will not be an unreasonable exaction to require them to furnish him periodically with full

statements of the expenditure by them of the moneys of their minor children received by them pursuant to the provisions of the statute that we have been considering.

"The conclusion is that the second question must be answered to the effect that the respondent cannot limit the amount to be paid to the relators as the parents of their minor children from the moneys distributable to them under the law, but can require from them the submission of periodical statements of accounts showing in detail the expenditure of the moneys so received. With this limitation on the scope of the writ of mandamus prayed for, it will issue as prayed.

"And it is so ordered.                          F. L. Siddons, Justice."

The judgment is affirmed, with costs.

SMYTH, Chief Justice (dissenting). This appeal is not for the purpose of determining finally the rights of the parents and the children to the money in question. We may inquire only as to whether the Secretary's decision has any support in the record. If it has, then his judgment, not ours, must prevail; in other words, unless he acted arbitrarily, we may not disturb his conclusion. Ashley v. Roper, 48 App. D. C. 69; Brougham v. Blanton Manufacturing Co., 249 U. S. 495, 39 Sup. Ct. 363, 63 L. Ed. 725; United States ex rel. Sykes v. Lane, 48 App. D. C. 48, 258 Fed. 520. In the recent case of United States ex rel. Hall v. Payne, 254 U. S. ——, 41 Sup. Ct. 131, 65 L. Ed. ——, decided December 13, 1920, the Supreme Court of the United States said that, where the action of the Secretary "was not arbitrary or capricious, but rested on a possible construction of the act," it would be affirmed.

The controversy seems to hinge upon whether or not a bonus is necessarily within the meaning of the word "royalties." It is according to the opinion of the court, but the definition of a bonus given therein does not support its conclusion. It says that a bonus may be considered as a "sum paid  *  *  *  upon a consideration in addition to or in excess of that which would ordinarily be given." The record shows that royalty is what would ordinarily be given. A bonus is something in excess of it. Does not the statute lend itself to this interpretation?

Moreover, is there not room for the belief that, as applied to oil lands, a royalty does not include a bonus? A writer upon the subject says:

"The consideration which the lessee pays for the lease must not be confounded with the consideration which the lessor is to receive for the oil and gas. The cash consideration, *bonus*, or whatever it may be called, paid or agreed to be paid by lessee for the lease, is a consideration for the exclusive privilege of entry for exploration.  *  .  *  *  When lessee discovers oil or gas in paying quantities, his right to produce them becomes a vested right. He is then, for the first time, authorized and obligated to pay the consideration to lessor for the exclusive vested right to produce the oil and gas, the true consideration for such minerals being the *royalty* of oils and cash rental for gas, as the case may be." Archer's Law and Practice in Oil and Gas Cases, p. 44.

This clearly indicates that there is a wide difference between a royalty and a bonus.

See also Brookshire Oil Co. v. Casmalia Oil & Development Co., 156 Cal. 211, 103 Pac. 927, and Venture Oil Co. v. Fretts, 152 Pa. 451, 25 Atl. 732.

For the purpose of interpreting the act we may look at the conditions existing, and presumably known' to Congress, at the time it was passed. United States v. Union Pacific R. R. Co., 91 U. S. 72, 23 L. Ed. 224; Siemen's Administrator v. Sellers, 123 U. S. 276, 8 Sup. Ct. 117, 31 L. Ed. 153; Smith v. Townsend, 148 U. S. 490, 13 Sup. Ct. 634, 37 L. Ed. 533. At that time bonuses were not resorted to in the Osage country. They did not come into existence until the expiration in 1916 of what is known as the Foster leases; hence were not within the contemplation of Congress at that time. Of course, if the language used clearly embraces them, the fact that they were not then in vogue would be, perhaps, immaterial; but. if it does not, the Secretary, as the person charged with the administration of the act, would be justified under the circumstances, to be noticed immediately, in refusing to stretch the language so as to include them.

When the act was passed the portion which each child derived from its lands annually was about $256, not more than was necessary for its support; but in 1920 the sum coming to it from interest and royalty alone was about $3,551, and from bonuses $4,730, making a total of $8,821 a year. May it not be said with reason that, while Congress was willing to intrust to the parents annually $256, or thereabouts, for each minor child, to be used for its benefit—for we cannot assume, in the absence of a specific direction on the subject, that Congress intended that the child's money should be used for any other purpose—it was not within its contemplation that the parents should have more than the support and education of the child required. The act provides in specific language for the payment to the parents of the royalties, and that must be done, though the amount is now much greater than then. But, unless bonuses come clearly within the definition of "royalties," and I have shown they do not, would it not be greatly in the interest of the child if this fund arising from bonuses, like other funds covered by the act, should be conserved by being deposited on interest until the child had reached its majority? Why did Congress provide for the payment of some of the child's money to the parents, and for the deposit of the remainder during the child's minority, unless it was intended that only so much as was necessary for the purposes of the child should be available to the parents? Considering the statute in the light of these circumstances I do not think it can be correctly said that the Secretary acted arbitrarily in holding that it would be more in keeping with the congressional purpose, as expressed in the act, to treat bonuses as a fund, not to be distributed as royalties, but to be deposited in the Treasury as other funds are required to be deposited under the act, or to be conserved in some other way, during the minority of the child.

The proviso giving to the Commissioner of Indian Affairs the right to withhold payments from the parents if he becomes satisfied that the money is being misused or squandered, carries with it the inciden-

tal right to make such rules and regulations as may be necessary to effectively carry out the purposes of the act. "Misused" means not used for the proper purpose. It is the minor's money that is paid to the parents, and, if used for the benefit of any one else, it is misused. To require that an account should be rendered to the Commissioner showing the purposes for which the money was spent seems to be within the scope of the Secretary's authority under the statute, and hence he would be justified in withholding payments so long as the parents refused to make such statements.

Believing that the Secretary did not act arbitrarily, but within the discretion lodged in him by Congress, I think the judgment of the lower court should be reversed, and hence I dissent.